UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— X

ANDREW STASIUM, *on behalf of himself and all others similarly situated*,

        *Plaintiff,*

v.

STUBHUB, INC.,

        *Defendant.*

———————————————————— X

Case No. _____

CLASS ACTION COMPLAINT

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff ANDREW STASIUM ("Plaintiff"), on behalf of himself and all others similarly situated, bring this Class Action Complaint against Defendant STUBHUB, INC. ("StubHub" or the "Defendant"),  for violations of federal, state, and common law set forth herein in connection with Defendant's misleading sales in the secondary market for World Cup 2026 Tickets in the United States during the applicable statutory period and continuing through the present day ("Class Period").

Plaintiff makes the following allegations based upon personal knowledge as to himself, as well as upon information and belief and investigation of their counsel as follows:

## **INTRODUCTION**

1.      Since 1930, countries around the world put aside their differences and meet on the soccer pitch for the World Cup – the global tournament which occurs every four years in a host country or region (the "World Cup").  For the 2026 World Cup, the United States, Canada, and Mexico were chosen for the first North American World Cup tournament in over three decades. The 2026 World Cup is organized by FIFA, which operates as FWC2026 US, INC., which is a subsidiary of FIFA.

2.      The host cities, which serve as the locations for the stadium matches across the host country or region, play a pivotal role: providing the forum for where each of the countries plays their tournament games, and, ultimately, the championship match.  The World Cup has taken place in North America four times throughout its nearly century of history, and fan anticipation in the United States in particular was never higher than it was and has been leading up to and including the 2026 World Cup.

3.      Unfortunately, with high anticipation comes a high likelihood of taking advantage of consumers who are willing to pay.  The rarity of World Cup games being played in the United

States means that the odds of consumers facing high prices and a difficult to navigate market were almost guaranteed.  Thus, many consumers, like Plaintiff and Class members, look to StubHub as a marketplace to purchase tickets for the event on the secondary (resale) market from those who initially bought tickets from FIFA directly.

4.     By way of background, FIFA possesses a lawful monopoly with a 100% market share over the distribution and sale of the 2026 North American World Cup tickets ("World Cup Tickets") on the primary market. This is not a fact in dispute, as Defendant's own terms and conditions limit the sale of tickets in the secondary/resale market admit as much, including through StubHub, stating in relevant part: "[t]he [FIFA] Marketplace is the [World Cup's] only authorized peer-to-peer marketplace platform for Tickets available to the general public. Tickets for the [World Cup] are only guaranteed to be valid when Transferred or Resold through the [FIFA] Marketplace.  Tickets obtained from any third-party sources are not authorized by FIFA [and] may be invalid and are purchased at your risk.   RESALE TICKETS PURCHASED VIA UNAUTHORISED RESALE CHANNELS MAY NOT BE VALID OR SOLD IN BREACH OF TICKET USE RESTRICTIONS APPLICABLE TO THOSE TICKETS AND MAY BE DECLARED INVALID OR CANCELLED BY FIFA TICKETING AT ANY TIME WITHOUT NOTICE."[1]

5.     The motivation behind this is simple.

6.     Because if FIFA controls the resale market and refuses to deal through the many secondary ticket brokers in the United States, it can extract a supracompetitive tax on the sale of each ticket in the resale market: 15% from each reseller and 15% from each purchaser for a total

---

[1] *FIFA World Cup 2026 Ticket Transfer and Resale Terms* (last updated June 18, 2026), at https://digitalhub.fifa.com/m/49fbe2de3d2fcb6a/original/FIFA-World-Cup-26-Ticket-Transfer-and-Resale-Terms.pdf, at § 11.6. (hereinafter, the "FIFA Resale Terms") (emphasis not added).

of 30% (the "FIFA Resale Tax"). For every World Cup fan seeking tickets on the resale market, FIFA benefits by forcing these consumers who buy secondary market World Cup Tickets to pass through its monopolistic digital box office.

7.      The problem, and what this Action focuses on, is that StubHub continues to not only sell World Cup Tickets for which it is not authorized, but also includes warranties called the Fan Protect Guarantee, for which it affirmatively promises the authenticity of these World Cup Tickets.  However, this has not been the case because Plaintiff and Class members, like so many hundreds (if not more) of World Cup fans, purchased World Cup Tickets only to find out that those tickets either did not exist, were revoked without any forewarning, or had been erased due to what FIFA calls "poor digital infrastructure."  StubHub misrepresents its authority to sell World Cup Tickets, then, when Plaintiff and Class members travel thousands of miles to attend World Cup matches, there are no tickets to be found despite having paid for them.

8.      Currently, with the lowest price for World Cup Tickets exceeding $1,245 to $3,000, with some well surpassing $10,000 in many instances, consumers are already paying exorbitant prices for each World Cup Ticket – the market price for World Cup Tickets is already well above what most consumers can afford.  And yet, the FIFA Resale Tax further distorts World Cup Ticket prices to astronomical levels, which motivates consumers, like Plaintiff and Class members, to purchase more affordable tickets on StubHub, a purportedly well-known vendor in the resale market for tickets to sporting events and concerts.

9.      Further, when tens of thousands of World Cup fans missed out on the initial opportunity to buy World Cup Tickets through FIFA's primary sale offering, they turned to the resale market with a choice: purchase from StubHub and avoid the FIFA Resale Tax or purchase from FIFA and pay prices they simply cannot afford.  This, however, is purely a Hobson's Choice

3

– as StubHub itself has stated that FIFA limits how Plaintiff and Class members can buy and sell World Cup Tickets.[2]  As the Associated Press reports, "FIFA has urged fans to buy resale tickets through its own marketplace, where it slaps a 30% surcharge on every resold ticket […] but many fans bought through other resale sites, either out of habit or because those sites have lower prices or are easier to navigate."[3]  And so, the internet has been flooded with complaints from consumers like Plaintiff and Class members who bought resold tickets through vendors like StubHub only to arrive at the stadium completely empty-handed.

10.      At this point, what is known is that Plaintiff and Class members are losing their tickets despite having legally purchased them, despite having being told they exist, and despite the Fan Protect Guarantee.  Whether the reason that this occurs is because of a mysteriously "poor infrastructure" which leads to the cancellation of the World Cup tickets does not matter.  What matters is that Plaintiff and Class members were lied to and purchased World Cup Tickets for large sums of money – only to incur tremendous financial losses due to the necessity to pay travel expenses, take off time from work, and for other ancillary costs. This is a new low for a sports ticketing industry that has been rampant with consumer protection issues time and time again, to the detriment of the fans who make sports what they truly are.

11.      Plaintiff and Class members are among the hundreds (if not more) World Cup fans who did not get what they paid for on the resale market due to StubHub's violations of the federal, state, and common laws and seek injunctive and declaratory relief as well as damages due to Defendant's conduct.  Additionally, Plaintiff and Class members are entitled to their costs of suit, attorneys' fees, and all other relief that this Court deems just and proper.

---

[2] R.J. Rico and Emilie Megniem, "*World Cup ticket buyers are left stranded as resale purchases fall through*," ASSOCIATED PRESS (VIA YAHOO! SPORTS ONLINE) (June 19, 2026), at https://sports.yahoo.com/articles/fans-fuming-world-cup-tickets-045037396.html.
[3] *Id.*

**JURISDICTION AND VENUE**

12.     This Action arises under federal, state, and common laws, including under the Magnuson-Moss Warranty Act (15 U.S.C. §§ 2301-2312, *et seq.*) ("MMWA"), with such relief to include: a declaratory judgment, equitable and injunctive relief, as well as a measure of damages (including actual damages, punitive damages and statutory damages), disgorgement of profit, costs of suit, pre- and post-judgment interest and reasonable attorneys' fees and costs, as permitted by statute.

13.     With respect to state and common law violations, Plaintiff and Class members seek relief for violations of (i) California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL", (ii) California's Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750, *et seq.* (only seeking injunctive relief) ("CLRA"), (iii) California's False Advertising Law (Cal. Bus. & Prof. Code. §§ 17500, *et. seq*) ("FAL"), (iv) breach of contract, and (v) conversion with such relief to include: injunctive relief, a measure of damages (including restitution, actual, nominal, punitive or exemplary damages, as well as statutory damages), costs of suit, pre- and post-judgment interest and reasonable attorneys' fees, as this Court deems necessary and proper.

14.     *Subject Matter and Supplemental Jurisdiction.*  Plaintiff brings this Action under the MMWA, such that subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332(d), and 1367.  This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 because Plaintiff asserts claims arising under federal law.  Additionally, this Court has supplemental jurisdiction over Plaintiff's state and common law claims under 28 U.S.C. § 1367 because all of their claims arise from the same facts and circumstances and form part of the same case or controversy.

15.     Additionally, this Court also has subject matter jurisdiction over Plaintiff's state law and common law claims under the Class Action Fairness Act of 2005 (28 U.S.C. § 1332(d))

5

("CAFA"). This Court has subject matter jurisdiction under CAFA because the amount in controversy exceeds the sum of $5,000,000 (exclusive of costs and interest), there are more than 100 putative members of the Class and minimal diversity exists between the litigants, as one or more of the Class members is a different citizen than Defendant. Namely, Plaintiff is domiciled in California whereas Defendant is headquartered in New York.

16. *Personal Jurisdiction.* This Court has personal jurisdiction over Defendant because its principal place of business is located in New York. Additionally, this Court has personal jurisdiction over Defendant because Defendant is registered to do business in New York and a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in New York.

17. *Venue.* Venue is proper in this District under 28 U.S.C. §1391(b), (c) and (d), because a substantial portion of the conduct described in this Class Action Complaint was carried out in this District. Further, Defendant maintains substantial business operations in this District.

## PARTIES

### PLAINTIFF

*Plaintiff Andrew Stasium*

18. Plaintiff Stasium is and was domiciled in Alameda County, California during the Class Period.

19. During the Class Period, Plaintiff paid StubHub $1,884.64 for two tickets to the 2026 World Cup match between France and Norway on June 26, 2026, which would take place in Foxborough, Massachusetts, at Gillette Stadium. Plaintiff received a notice that his tickets were canceled on June 20th, 2026. Plaintiff was subsequently issued new tickets on June 21st, 2026, only to find himself not being able to download them. Plaintiff contacted StubHub through their phone number and via their online chat, and despite its Fan Protect Guarantee, StubHub was unable

to provide comparable replacement tickets. Plaintiff had already lost sums of money for travel costs, as well as time, due to being misled by StubHub. He ultimately had to purchase replacement tickets, which cost him much more than he intended to spend.

20.     Plaintiff was promised a refund but has yet to receive it.

21.     Had Plaintiff known that StubHub was either unable to deliver or not authorized to deliver his World Cup Tickets to him, he never would have purchased them.  Plaintiff reasonably believed and relied on StubHub's representation that they would produce his tickets – and, even after spending $1,884.64 for them, never received them.  Plaintiff suffered harm by way of the monies he lost due to StubHub's misrepresentations, omissions, and conversion of his funds.

**DEFENDANT**

***Defendant StubHub, Inc.***

22.     Defendant StubHub, Inc. is a Delaware corporation headquartered in New York, New York, located at 4 World Trade Center, New York, New York 10007.

**FACTUAL ALLEGATIONS**

*Background Information*

23.     StubHub publicly represents itself as a seller of ticket for sporting events, concerts, theatre, and festivals.[4]  Amongst the sporting event tickets that StubHub sells, are World Cup Tickets, which StubHub continues to sell up and including the date of the filing of this Action on behalf of Plaintiff and Class members, as can be seen below:

---

[4] https://www.stubhub.com, (last accessed July 5, 2026).

7



**IMAGE 1**: StubHub's Sale of World Cup Tickets

24.　　Not only does StubHub continue to sell World Cup Tickets despite extremely negative press about the vanishing of the World Cup Tickets that they purportedly sold – which is what occurred to Plaintiff and Class members – but StubHub advertises its Fan Protect Guarantee which can also be seen above in Image 1. On that page, the Fan Protect Guarantee states, "[StubHub] back[s] every order so you can buy and sell tickets with 100% confidence."

25.　　However, and contrary to StubHub's website and the Fan Protect Guarantee, it knowingly sold World Cup tickets that it either did not have or could not supply. This led to a flood of consumer complaints and articles about StubHub's misleading sales of World Cup Tickets to fans.

26.　　For example, The Guardian published and article called "Here's what to do if your StubHub World Cup resale ticket is canceled," which stated "[a] growing number of World Cup fans who thought they had bought tickets to matches on the ticket reseller StubHub were notified just days or hours to spare that their tickets did not exist. Horror stories about stranded families, ruined once in a lifetime trips, thousands of dollars squandered, and hang-ups on StubHub's

customer service line are flooding social media and local news. It's the latest sign of powerlessness many consumers feel in the US, say advocates who estimate thousands of World Cup fans may have been affected."[5]

27.     According to Brian Hess of the Sports Fans Coalition, "[t]he system is flawed at all levels, consumers should not have to fight like this"[6]

28.     StubHub has responded to this stating, "[t]he issues fans have experienced at this World Cup are transfer problems, not ticket problems."[7] Before deflecting blame to FIFA itself and "significant performance issues that have affected ticket transfers across all resale platforms" that are 'outside of StubHub's control.'[8]

29.     Even for World Cup fans who argue that they should be given replacement tickets as opposed to a refund (or, in the case of Plaintiff – nothing), the Fan Protect Guarantee resulted in many fans getting World Cup Tickets that were worse than those which they had initially purchased.[9] At this point, an attorney in Texas has accumulated more than 150 clients who were ripped off or mislead by StubHub and are owed millions of dollars.[10]

30.     FIFA, naturally deflected blame back onto StubHub for selling these tickets in the first place. [11] FIFA stated, "[w]ith reference to the reliability of the services available to fans on FIFA's official ticket platform, FIFA rejects any suggestion that the functional issues being

---

[5] Heather Timmons, "*Here's what to do if your StubHub World Cup resale ticket is cancelled*," THE GUARDIAN (ONLINE) (June 27, 2026), at  https://www.theguardian.com/usnews/2026/jun/27/stubhub-world-cup-resale-ticket.
[6] *Id*.
[7] *Id*.
[8] *Id*.
[9] *Id*.
[10] *Id*.
[11] Shariq Khan and Amy Tennery, "*World Cup fans flustered by last-minute StubHub ticket cancellations*," REUTERS (ONLINE) (Updated June 29, 2026), at https://www.reuters.com/sports/soccer/world-cup-fans-left-flustered-by-last-minute-stubhubticket-cancellations-2026-06-26/.

experienced by users of third-party platforms with respect to FIFA World Cup 2026 tickets are the result of FIFA's ticketing infrastructure."[12]

31.    Put simply, these are tickets that StubHub should not have sold then attempted to deflect blame for its misrepresentations and omissions onto FIFA.

32.    The reality is the FIFA made it known that World Cup Tickets should only be sold through its platform – and StubHub either knew or should have known this. As the FIFA Resale Terms state: "[t]he [FIFA] Marketplace is the [World Cup's] only authorized peer-to-peer marketplace platform for Tickets available to the general public. Tickets for the [World Cup] are only guaranteed to be valid when Transferred or Resold through the [FIFA] Marketplace. Tickets obtained from any third-party sources are not authorized by FIFA [and] may be invalid and are purchased at your risk. RESALE TICKETS PURCHASED VIA UNAUTHORISED RESALE CHANNELS MAY NOT BE VALID OR SOLD IN BREACH OF TICKET USE RESTRICTIONS APPLICABLE TO THOSE TICKETS AND MAY BE DECLARED INVALID OR CANCELLED BY FIFA TICKETING AT ANY TIME WITHOUT NOTICE."[13]

33.    Thus, StubHub should not have sold these tickets in the first instance – and the heartache and loss suffered by World Cup fans like Plaintiff and Class members never would have occurred.

### Harm to Plaintiff and Class Members

34.    Plaintiff and Class members were deliberately misled by StubHub when it: (1) represented it could sell World Cup Tickets to consumers, (2) would refund tickets consistent with

---

[12] *Id.*

[13] FIFA World Cup 2026 Ticket Transfer and Resale Terms (last updated June 18, 2026), at https://digitalhub.fifa.com/m/49fbe2de3d2fcb6a/original/FIFA-World-Cup-26-Ticket-Transferand-Resale-Terms.pdf, at § 11.6. (hereinafter, the "FIFA Resale Terms") (emphasis not added).

10

the Fan Protect Guarantee, and (3) omitted that it did not have the authority to sell the World Cup Tickets that it claimed it had the ability to sell.

35.     Had Plaintiff and Class members known that StubHub was either unable to deliver or not authorized to deliver her World Cup Tickets to them, they never would have purchased them. Plaintiff and Class members reasonably believed and relied on StubHub's representation that they would produce their tickets – and, even after spending money for them, and yet they never received them. Plaintiff and Class members suffered harm by way of the monies she lost due to StubHub's misrepresentations, omissions, and conversion of her funds – as well as the time that they had lost as a result of traveling to stadiums and dealing with StubHub to be reimbursed or given replacement tickets.

*California Law Applies and StubHub's Arbitration Provision Does Not Apply*

36.     According to StubHub's Terms of Service, California law applies to all disputes that arise between StubHub and Plaintiff and Class members. Thus, California law applies to the entirety of the claims in this Action as well as those of the Plaintiff and Class members in this Action.

37.     According to StubHub's Terms of Service, California law applies to all disputes that arise between StubHub and Plaintiff and Class members. Thus, California law applies to the entirety of the claims in this Action as well as those of the Plaintiff and Class members in this Action.

## CLASS ACTION ALLEGATIONS

38.     This Action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23, Rules 23(a), 23(b)(1), 23(b)(2) and 23(b)(3).  Plaintiff brings this class action

on behalf of himself and all other similarly situated individuals.  The nationwide class Plaintiff

seeks to represent is defined as follows:

> **Nationwide Class.**  All natural persons in the United States for whom Defendant aggregated, collected, retained, sold or otherwise profited from their PII or other sensitive information.

39.    In the alternative to the nationwide class, Plaintiff seeks to represent the following

statewide sub-class pursuant to Federal Rules of Civil Procedure, Rules 23(a) and 23(b)(3):

> **California State Sub-Class.** All natural persons in the State of California for whom Defendant aggregated, collected, retained, sold or otherwise profited from their PII or other sensitive information.

40.    Excluded from the Classes are (1) Defendant and Defendant's subsidiaries,

affiliates, officers and directors, and any entity in which Defendant has a controlling interest; (2)

Plaintiff's counsel; and (3) all judges assigned to hear any aspect of this litigation as well as their

immediate family members.

41.    Plaintiff reserves the right to modify or amend the definition of the proposed Class

before the Court determines whether certification is appropriate.

42.    *Numerosity.*  Plaintiff does not know the exact number of Class members because

such information is in the exclusive control of Defendants or others.  Plaintiff believes that, due

to the nature of the trade and commerce involved, there are millions of Class members

geographically dispersed throughout the United States, such that joinder of all Class members is

impracticable.

43.    *Typicality.*  Plaintiff's claims are typical of those of other Class members because

Plaintiff, like every other Class member, was harmed by way of the unlawful privacy-violating

conduct as alleged herein.  Plaintiff, like all other Class members, was injured by Defendant's

uniform conduct.  Plaintiff is advancing the same claims and legal theories on behalf of himself

and all other Class members, such that there are no defenses unique to Plaintiff. The claims of Plaintiff and those of the other Class members arise from the same operative facts and are based on the same legal theories.

44.    *Commonality.*  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members.  These common questions of law and fact include, without limitation:

i.    Whether Defendant violated Plaintiff's and the Classes' privacy rights;

ii.    Whether Defendant's acts and practice violate the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 638.51;

iii.    Whether Defendant's acts and practices violate the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200;

iv.    Whether Defendant's acts and practices violate the California Constitution, Article I, Section 1;

v.    Whether Defendant's acts and practices constitute common law intrusion upon seclusion;

vi.    Whether Plaintiff and Class members are entitled to damages and/or equitable relief, including injunctive relief, restitution, and disgorgement of profit into a constructive trust;

vii.    Whether Defendant was unjustly enriched; and

viii.    The appropriate class-wide measure of damages as well as whether Plaintiff and Class members are entitled to such damages and other relief.

45.    *Adequacy of Representation.*  Plaintiff will (and has) fairly and adequately represent and protect the interests of the Class members in that he has no disabling or

disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights that Plaintiff suffered are typical of other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class. Plaintiff has retained counsel experienced in data privacy class action litigation, and Plaintiff intends to prosecute this action vigorously.

46. *Superiority of Class Action.* A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class' common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

47. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

48. Adequate notice can be given to Class members directly using information maintained in the parties' records.

49. *Predominance.* The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

50.    This proposed class action does not present any unique management difficulties. Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### VIOLATION OF THE MAGNUSON MOSS WARRANTY ACT
### 15 U.S.C. §§ 2301-2312, et seq.
### ON BEHALF OF THE NATIONWIDE CLASS

51.    Plaintiff realleges and repeats each and every allegation from the preceding paragraphs as if fully realleged and set forth herein.

52.    The MMWA governs written warranties for consumer products, including preventing companies, like Defendant, from providing misleading warranties and allowing a private right of action for breaches of warranty.

53.    Defendant makes warranties with respect to the Fan Protect Guarantee, including with respect to World Cup Tickets, stating: "[StubHub] back[s] every order so you can buy and sell tickets with 100% confidence." Under the MMWA, Defendant is also so obligated to give timely and complete performance of warranty obligations – which they have failed to do for Plaintiff and Class members.

54.    As stated by the Federal Trade Commission, to whom Plaintiff and Class members reported their concerns, "[o]bviously, warranties must not contain deceptive or misleading terms. You cannot offer a warranty that appears to provide coverage, but, in fact, provides none." In this instance, the Fan Protect Guarantee is deceptive and misleading because they either are not refunding World Cup Tickets at all, merely refunding tickets in a delayed manner, or providing tickets that are not of the same value that were originally purchased.

15

55.    The MMWA allows consumers to recover damages, as well as court costs and reasonable attorneys' fees, which is what Plaintiff and Class members are pursuing in addition to any other damages this Court deems just and proper.

## SECOND CAUSE OF ACTION

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### ON BEHALF OF THE NATIONWIDE AND CALIFORNIA STATE SUB-CLASS

56.    Plaintiff realleges and repeats each and every allegation from the preceding paragraphs as if fully realleged and set forth herein.

57.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. A business practice need satisfy only one of the three prongs to violate the UCL. Defendant's conduct violates the unlawful and the unfairness prongs.

58.    **Unlawful Prong.** Defendant's conduct is "unlawful" because it violates the MMWA, the CLRA, the FAL and numerous common law claims. The UCL borrows these violations as independently sufficient predicates for "unlawful" conduct.

59.    **Unfairness Prong.** Defendant's conduct is "unfair" because the gravity of the harm to Plaintiff and Class members — the sale of World Cup Tickets without being authorized to do so or unable to do so — substantially outweigh any utility to Defendant's make money off of the sale of these tickets. Defendant's conduct also offends public policy as reflected in California's consumer protection laws. No consumer reasonably would have known that StubHub, a purportedly well-known vendor for the resale of tickets, did not have the ability to consummate the transactions as promised. This imbalance of power and information is precisely the type of conduct the UCL was designed to address.

60.    Plaintiff and Class members have suffered injury in fact and lost money or property as a result of Defendant's unfair and unlawful conduct.

61.    Plaintiff and Class members are entitled to restitution and disgorgement of Defendant's ill-gotten profits, as well as injunctive relief preventing Defendant from continuing its unlawful, unfair, and fraudulent business practices. Cal. Bus. & Prof. Code §§ 17203, 17204.

## THIRD CAUSE OF ACTION

## VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ON BEHALF OF THE NATIONWIDE AND CALIFORNIA STATE SUB-CLASS

62.    Plaintiff realleges and repeats each and every allegation from the preceding paragraphs as if fully realleged and set forth herein.

63.    The CLRA prohibits deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service, including selling products that do not have the qualities or representations that they purport to have.

64.    Defendant committed deceptive acts or practices by employing false, misleading, and deceptive representations and/or omissions about the sale of World Cup Tickets.

65.    Information as to the content in each of their World Cup Tickets were in the exclusive control of Defendant. Plaintiff could not possibly have known that the representations were not only false, but misleading.

66.    Because Plaintiff bought these World Cup Tickets, Plaintiff has standing to pursue this claim because he has suffered an economic injury due to lost money or property as a result of Defendant's acts or practices. When Plaintiff purchased the World Cup Tickets, he relied on false, misleading, and deceptive representations that the World Cup Tickets were being sold consistent with advertising on Defendant's website and application. Plaintiff spent money on the transaction that he otherwise would not have spent had he known the truth about Defendant's Products.

17

67.    Defendant's conduct was deceptive in a materially misleading way because it violates consumer's reasonable expectations.

68.    Defendant knew that this information about the World Cup Tickets it was going to sell, which are specifically marketed toward sports fans and other consumers, remain material to these types of consumers. As a result of its deceptive acts and practices, Defendant sold millions of units of the World Cup Tickets to unsuspecting consumers nationwide, as well as to thousands of unsuspecting consumers nationwide, and in New York and California.

69.    As a direct and proximate result of Defendant's false, misleading, and deceptive representations and/or omissions, Plaintiff and Class members were injured in that they: (1) paid for the World Cup Tickets that were not what Defendant represented and (2) were deprived of the benefit of the bargain because these World Cup Tickets were not actually sold as promised. On behalf of himself and Class members, Plaintiff seeks to enjoin Defendant's unlawful acts and practices by not allowing Defendant to continue to sell World Cup Tickets.

70.    Additionally, on behalf of himself and Class members, Plaintiff also seeks to recover their actual damages or statutory penalties, whichever is greater, and three times their actual damages, as well as reasonable attorneys' fees.

71.    Plaintiff will amend their Complaint to give notice regarding the applicability of damages under the CLRA after a 30-day window to cure.

### FOURTH CAUSE OF ACTION

**VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW**
**ON BEHALF OF THE NATIONWIDE AND CALIFORNIA STATE SUB-CLASS**

72.    Plaintiff realleges and repeats each and every allegation from the preceding paragraphs as if fully realleged and set forth herein.

18

73.    Defendant engaged in a systematic campaign of false and misleading advertising and marketing with regard to the ability to adequately sell World Cup Tickets through its website or platform, which was entirely untrue. Additionally, Defendant engaged in a systematic campaign of false and misleading advertising regarding the Fan Protect Guarantee.

74.    When Plaintiff purchased World Cup Tickets from Defendant, he relied on false, misleading, and deceptive representations, as well as omissions to the contrary, which led them to believe that the Products were as advertised. Plaintiff spent money in the transaction that he otherwise would not have spent had he known the truth.

75.    Defendant knew that this information about the World Cup Tickets it was going to sell, which are specifically marketed toward sports fans and other consumers, remain material to these types of consumers. As a result of its deceptive acts and practices, Defendant sold millions of units of the World Cup Tickets to unsuspecting consumers nationwide, as well as to thousands of unsuspecting consumers nationwide, and in New York and California.

76.    As a direct and proximate result of Defendant's false, misleading and deceptive representations and/or omissions, Plaintiff and Class members were injured in that they: (1) paid for the World Cup Tickets that were not what Defendant represented and (2) were deprived of the benefit of the bargain because these World Cup Tickets were not actually sold as promised. On behalf of himself and Class members, Plaintiff seeks to enjoin Defendant's unlawful acts and practices.

77.    On behalf of himself and Class members, Plaintiff also seeks to recover their actual damages or applicable statutory penalties, whichever is greater, and three times their actual damages, as well as reasonable attorneys' fees.

19

**FIFTH CAUSE OF ACTION**

**CONVERSION**
**ON BEHALF OF THE NATIONWIDE AND CALIFORNIA STATE SUB-CLASS**

78.     Plaintiff realleges and repeats each and every allegation from the preceding paragraphs as if fully realleged and set forth herein.

79.     Defendant received benefits from Plaintiff and Class members and unjustly retained those benefits at their expense through converting the funds that were supposed to be received for the purchase of World Cup Tickets.

80.     Defendant received benefits from Plaintiff and Class members in the form of the Plaintiff and Class members' compensation they paid for the World Cup Tickets they thought they were receiving.

81.     These purchases provided the Defendant with economic, intangible, and other benefits, including money.

82.     Had Plaintiff and Class members known of Defendant's misconduct, they would not have paid for World Cup Tickets from the Defendant.

83.     Defendant unjustly retained these benefits at the expense of Plaintiff and Class members because Defendant's conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and Class members.

84.     The benefits that Defendant derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It would be inequitable for Defendant to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Action.

20

85.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## **DEMAND FOR RELIEF**

86.    To remedy these illegal acts, Plaintiff requests the following relief:

b.    Certify the Classes and appoint Plaintiff as the Classes' representative;

c.    Declaring and adjudging that the conduct of Defendant is unlawful and violates the federal and state law;

d.    Disgorging Defendant's profits from its unlawful data privacy scheme into a constructive trust;

e.    Awarding to Plaintiff the costs of his suit, including reasonable attorneys' fees;

f.    Awarding to Plaintiff his damages, in the amount to be determined by a jury, inclusive of statutory and/or treble damages as provided by the applicable federal and state laws;

g.    Awarding restitution and disgorgement of Defendant's unlawfully obtained profits to Plaintiff and Class members;

h.    Granting permanent injunctive relief requiring Defendant to cease its unlawful data collection, interception, and advertising monetization practices and to delete all unlawfully collected PII;

i.    Granting to Plaintiff and Class any such other relief to which they may be entitled and which this Court deems just and proper.

## **JURY TRIAL DEMANDED**

21

Plaintiff demands a trial by jury on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

Dated: July 7, 2026

Respectfully submitted,

By: */s/ Blake Hunter Yagman*
Blake Hunter Yagman
**YAGMAN PLLC**
626 RexCorp Plaza, Suite 605
Uniondale, New York 11556
T: (929) 709-1493
blake.yagman@yagmanpllc.com

Kevin Laukaitis (PHV Forthcoming)
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
T: (215) 559-6072
klaukaitis@laukaitislaw.com

Counsel for Plaintiff and
the Proposed Classes

22